**Annette Greco LITMAN, Plaintiff,**

v.

**GEORGE MASON UNIVERSITY et al., Defendants.**

**No. Civ.A. 97–1755–A.**

United States District Court, E.D. Virginia, Alexandria Division.

May 7, 1998.

Annette Kay Rubin, Leesburg, VA, for Annette Greco Litman.

Ronald C. Forehand, Asst. Atty. Gen., Richmond, VA, for George Mason University, Geoffrey Orsak, Girard Mulherin.

James V. Ingold, Fairfax, VA, for Eugene M. Norris.

### MEMORANDUM OPINION

CACHERIS, District Judge.

This matter comes before the Court on Defendant George Mason University's ("GMU") Motion to Dismiss Counts I and II; Defendant Dean Girard Mulherin's ("Mulherin") Motion for Summary Judgment; Plaintiff's Motion to Exclude Treating Healthcare Providers from the Requirement of Preparing a Written Report Pursuant to Fed.R.Civ. Pro. 26(a)(2)(B); and Plaintiff's Motion to Reconsider the Court's ruling dismissing her Equal Protection claim as to Defendants Orsak and Mulherin.

## I.

Plaintiff Annette Greco Litman ("Litman") began attending GMU in the Summer of 1995 as a student in the extended studies program. In the Fall of 1995, she signed up for a computer science class, taught by Professor Norris. Litman also accepted a position as Norris' research assistant. Litman alleges that Norris misrepresented the course requirements to her and that it therefore became necessary for her to seek extra help from Norris. During the period while she was Norris' student and research assistant, Litman alleges that Norris engaged in a course of behavior towards her that began with his paying extra attention to her and sitting close to her, and escalated to the point that, when they would have lunch together, Norris initiated conversations about Litman's marriage, and, specifically, about her sex life with her husband. Litman alleges that Norris was particularly interested in talking about, for example, the fact that Litman and her husband slept in separate beds. Litman claims that this culminated, in November of 1995, in Norris' telling her that he was falling in love with her.

At this point, Litman alleges that she sought the advice of Professor Orsak, an Associate Professor of Electrical and Computer Engineering at GMU. Litman claims that his only response was to suggest that she report any possible sexual assault to the campus police. In January, 1996, Litman states that she terminated her research position with Professor Norris. After this, Norris allegedly sent Litman an e-mail which read: "Don't marry someone you can live with/ Marry someone you can't live without." At this point, Litman began to suffer mental-

ly and physically from the stress of this situation. Again, she sought counsel from Orsak, who, this time, referred her to the Student Development Office.

Norris apparently continued to bother Litman, even looking up her schedule using faculty codes and showing up outside classrooms where he knew that she would be present. As this continued, Litman filed a complaint with the Equity Office.

Litman had trouble finding a Professor to advise her work on her Senior Project after she stopped working for Norris. She claims that she was too emotionally distressed to be in personal contact with any professors. At one point, she was contacted by one of her professors, Dr. Paris, for permission to use her homework as an example for the rest of the class. Litman responded by giving her permission but also sending him an e-mail which she states was "suggestive, sarcastic and angry." She later apologized.

For reasons not fully explained in Plaintiff's Complaint, Professors Paris and Orsak filed a complaint against Litman in the Equity Office that spring, reporting that Litman had been sexually harassing them. Litman was upset, and she proceeded to e-mail faculty members about her concerns regarding her treatment by Paris, Orsak, and Norris. Litman also contacted the Equity Office again, and she also circulated a petition regarding her complaints against Norris.

Litman's hearing was scheduled for May 30. She sought to postpone the disciplinary proceedings, claiming that she needed more time due to her emotional distress and the sedatives she was taking for stress. Her request was denied, and the disciplinary proceedings took place as scheduled on May 30. Dean Mulherin, GMU's Judicial Administrator, was in charge of the proceedings. Litman claims that there were several procedural irregularities, for example, she was not allowed to question Orsak about specific pieces of correspondence which he claimed were harassing. Litman was found guilty. She was permanently expelled from GMU, academic sanctions were imposed regarding her incomplete grades, and she was forbidden to enter any GMU campus or to speak with any of the faculty involved, with the exception of Dean Mulherin.

Litman's sexual harassment claims against Norris were tried on October 17, 1996. The disciplinary panel found that Norris had not violated GMU sexual harassment policy but had failed to live up to GMU "standards" related to that policy. No sanctions were imposed against Norris.

On October 31, 1997, Litman filed her Complaint against GMU, Norris, Orsak, and Mulherin, under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.; 42 U.S.C. § 1983; and state law. She claimed Gender Discrimination in Violation of Title IX (Against GMU) (Count I); Retaliation in Violation of Title IX (Against GMU) (Count II); Deprivation of Free Speech Rights Under Color of Law (Against Orsak, Mulherin and GMU) (Count III); Deprivation of Due Process Under Color of Law (Against GMU, Orsak and Mulherin) (Count IV); Deprivation of Equal Protection Rights Under Color of Law (Against Norris, Orsak, Mulherin, and GMU) (Count V); and Intentional Infliction of Emotional Distress (Against Norris) (Count VI).

By Order dated January 22, 1998, this Court granted Defendant's Motion to Dismiss Count III; granted Defendants' Motion to Dismiss Count IV in part ("Count IV is Dismissed as against Defendants George Mason University and Orsak, but Count IV remains as against Defendant Mulherin"); granted Defendants' GMU, Orsak, and Mulherin's Motion to Dismiss Count V; and denied Defendant Norris' Motion to Dismiss Counts V and VI. The Court deferred ruling on Defendant GMU's Motion to Dismiss Counts I and II, in order to permit the United States an opportunity to intervene in accordance with 28 U.S.C. § 2403(a). On February 18, the Court granted the United States' motion for intervention of right in order to give the United States the opportunity to be heard on the issue of the constitutionality of the abrogation of states' Eleventh Amendment immunity under Title IX. The Court accepted additional briefs from all parties and heard argument from all parties on the abrogation issue on March 12, 1998.

## II.

In support of its motion to dismiss Counts I and II, GMU argues that the Eleventh Amendment deprives this Court of jurisdiction over these claims. Specifically, GMU argues that 42 U.S.C. § 2000d-7 is unconstitutional to the extent that it purports to abrogate the States' Eleventh Amendment immunity for Title IX questions.

### A.

■ "The burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss is on the plaintiff, the party asserting jurisdiction." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). "[T]he complaint will be construed broadly and liberally, in conformity with the principle set forth in Rule 8(f), but argumentative inferences favorable to the pleader will not be drawn." 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (1990).

> [S]ubject matter jurisdiction deals with the power of the court to hear the plaintiff's claims in the first place, and therefore imposes upon courts an affirmative obligation to ensure that they are acting within the scope of their jurisdictional power. Accordingly, upon a challenge to the court's jurisdiction by a party, the court should conduct a careful inquiry and make a conclusive determination whether it has subject matter jurisdiction or not, or at least defer the inquiry if it is intertwined with the merits of the case.

Id. (1997 Pocket Part).

### B.

In *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court held that, notwithstanding Congress' clear intent to abrogate the States' sovereign immunity, the Indian Commerce Clause does not grant Congress that power, and therefore the Indian Gaming Regulatory Act cannot grant jurisdiction over a state that does not consent to be sued. More broadly, in overruling its plurality decision in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) the Supreme Court limited Congress' authority

to abrogate States' Eleventh Amendment immunity to those provisions enacted pursuant to its power under 5 of the Fourteenth Amendment. *Id.* at 1127.

In overruling Union Gas, the Supreme Court held that, if Congress attempts to abrogate the States' sovereign immunity pursuant to some other source of Congressional power, such as Congress' Article I powers, then the abrogation is invalid:

> It was well established in 1989 when *Union Gas* was decided that the Eleventh Amendment stood for the constitutional principle that state sovereign immunity limited the federal courts, jurisdiction under Article III..... As the dissent in *Union Gas* recognized, the plurality's conclusion—that Congress could under Article I expand the scope of the federal courts' jurisdiction under Article III—'contradict[ed] our unvarying approach to Article III as setting forth the exclusive catalog of permissible federal court jurisdiction.' Never before the decision in *Union Gas* had we suggested that the bounds of Article III could be expanded by Congress operating pursuant to any constitutional provision other than the Fourteenth Amendment. Indeed, it had seemed fundamental that Congress could not expand the federal courts beyond the bounds of Article III.

*Id.* at 1127–28 (citation omitted) (emphasis in original).

■ In order to determine whether Congress' attempt to abrogate States' sovereign immunity for Title IX actions is valid, this Court must follow the two-part test set forth in *Seminole Tribe*. First, the court must ask whether Congress has "unequivocally expresse[d] its intent to abrogate immunity." *Id.* at 1123. If so, the court must then ask whether Congress has acted "pursuant to a valid exercise of power," that is, pursuant to § 5 of the Fourteenth Amendment. *Id.*

GMU concedes that Congress, by enacting 42 U.S.C. § 2000d-7, has expressed its intention to abrogate the State's Eleventh Amend-

ment immunity for Title IX actions.[1] The issue for the Court is, thus, whether Congress, in purporting to abrogate the Eleventh Amendment for Title IX claims, acted pursuant to § 5 of the Fourteenth Amendment.

▪ "Congress' failure to mention that it acted pursuant to Section Five of the Fourteenth Amendment is not dispositive." *CSX Transportation, Inc. v. Board of Public Works of the State of West Virginia*, 138 F.3d 537, (4th Cir.1998).

> It is in the nature of our review of congressional legislation defended on the basis of Congress's powers under § 5 of the Fourteenth Amendment that we be able to discern some legislative purpose or factual predicate that supports the exercise of that power. That does not mean, however, that Congress need anywhere recite the words "section 5" or "Fourteenth Amendment" or "equal protection" for "the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."

*EEOC v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064, n. 18, 75 L.Ed.2d 18 (citing *Fullilove v. Klutznick*, 448 U.S. 448, 476–478, 100 S.Ct. 2758, 2773–74, 65 L.Ed.2d 902 (1980); *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948)). The "appropriate test for determining when Congress intends to enforce the guarantees of the Fourteenth Amendment" when Congress' intent is *ambiguous*, however, favors a finding that Congress did not intend to act pursuant to its section 5 powers. "Because such legislation imposes constitutional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Gregory v. Ashcroft*, 501 U.S. 452, 469, 111 S.Ct. 2395, 2405–06, 115 L.Ed.2d 410 (1991) (citing *Pennhurst State School and*

*Hospital v. Halderman*, 451 U.S. 1, 16, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981)).

The Eighth Circuit has relied upon language in *EEOC v. Wyoming* and has fashioned a somewhat different inquiry:

> Because Congress need not expressly invoke the authority of a specific constitutional provision to act pursuant to it, we believe that the latter condition requires us to make an objective inquiry, namely, whether Congress could have enacted the legislation at issue pursuant to a constitutional provision granting it the power to abrogate. As long as Congress had such authority as an objective matter, whether it also had the specific intent to legislate pursuant to that authority is irrelevant.

*Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir.1997). *See also Franks v. Kentucky School for the Deaf*, 142 F.3d 360, 1998 WL 193177 (6th Cir.1998); *CSX Transportation*, 138 F.3d 537, 1998 WL 100394 at *2 (4th Cir.1998) (citing *Crawford* with favor).

The questions of whether Congress acted pursuant to its powers under § 5 of the Fourteenth Amendment, or whether it could have acted under its § 5 powers, implicate the Court's recent decision in *City of Boerne v. Flores,* —— U.S. ——, ——, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997). In *Boerne*, the Court held that Congress' power under § 5 of the Fourteenth Amendment is limited to enforcing the substantive guarantees of the Fourteenth Amendment. *Id.* at 2163. "The power granted to Congress by Section Five of the Fourteenth Amendment is limited to the promulgation of remedial or preventive legislation that enforces the provisions of the Fourteenth Amendment and does not extend to substantive legislation that defines the Amendment's restrictions on the states." *CSX Transportation*, 138 F.3d 537, 539 (citing *Boerne*, —— U.S. at ——, 117 S.Ct. at 2164). Therefore, if § 2000d–7 is substantive rather than remedial, the statute cannot be a

---

1. "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C.A. § 794], title IX of the Education Amendments of 1972 [20 U.S.C.A. § 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C.A. § 6101 et seq.], title VI of the Civil Rights Act of 1964[42 U.S.C.A. § 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal fund assistance." 42 U.S.C.A. § 2000d–7 (1994).

valid exercise of Congress's Equal Protection Clause enforcement powers. *Id.* at 540 n. 3, at \*2, n. 3. It is important to note that the three Circuit courts who have held that § 2000d–7 is constitutional as a proper exercise of Congress' § 5 enforcement powers did not consider the *Boerne* case. *See Franks v. Kentucky School for the Deaf,* 142 F.3d 360 (6th Cir.1998); *Doe v. University of Illinois,* 138 F.3d 653 (7th Cir.1998) (briefed prior to the Court's decision in *Boerne* ); *Crawford v. Davis,* 109 F.3d 1281 (8th Cir.1997) (decided prior to the Court's decision in *Boerne* ).

Section 2000d–7 purports to abrogate States' immunity generally and uniformly in suits brought under Title IX, Title VI, the ADEA, the Rehabilitation Act, and "the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." *See supra,* note 1. In order to determine whether Congress has the authority to abrogate the States' sovereign immunity with respect to Title IX claims, the Court must examine the purpose behind Title IX itself.

█ Title IX prohibits discrimination on the basis of sex by entities receiving federal funds. The language of Title IX, its legislative history, and analogous case law, demonstrate that Title IX was passed pursuant to Congress' powers under the Spending Clause.

In *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court expressly declined to determine the constitutional basis for Congress' enactment of Title IX. 503 U.S. at 75, n. 8, 112 S.Ct. 1028, 1038, n. 8, 117 L.Ed.2d 208. However, the Supreme Court has held that Title IX is analogous to Title VI, and that Title VI is Spending Clause legislation. In *Cannon v. University of Chicago,* 441 U.S. 677, 696, 99 S.Ct. 1946, 1957, 60 L.Ed.2d 560 (1979), the Court enumerated the parallels between Title IX and Title VI:

> Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word "sex" in Title IX to replace the words "race, color, or national origin" in Title VI, the two statutes use identical language to describe the benefited class. Both statutes provide the same administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination. Neither statute expressly mentions a private remedy for the person excluded from participation in a federally funded program. The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years.

*Cannon,* 441 U.S. at 695–96, 99 S.Ct. at 1956–57 (citing legislative history in notes 16–19). The Court found that "Title VI is spending-power legislation." *Guardians Ass'n v. Civ. Serv. Com'n of City of N.Y.,* 463 U.S. 582, 598–99, 103 S.Ct. 3221, 3230–31, 77 L.Ed.2d 866 (1983). Reading *Cannon* and *Guardians* together, it is likely that the Supreme Court would find that Title IX is also spending-power legislation.

The Fifth and Eleventh Circuits have also found that Title IX is an exercise of Congress' spending power. *See Davis v. Monroe County Bd. of Educ.,* 120 F.3d 1390, 1397–99 (11th Cir.1997); *Rowinsky v. Bryan Independent School Dist.,* 80 F.3d 1006, 1012–13 and n. 14 (5th Cir.1996). Both circuit courts also relied upon the Supreme Court's decisions in *Cannon* and *Guardian,* and the legislative history of Title IX. The Eleventh Circuit summarized the legislative history of Title IX in support of its argument that Title IX is spending-power legislation:

> When Congress conditions the receipt of federal funding upon a recipient's compliance with federal statutory directives, Congress is acting pursuant to its spending power. The legislative history of Title IX indicates that Congress intended to impose upon recipients of federal educational assistance a requirement of nondiscrimination on the basis of sex. The Spending Clause authorized Congress to impose this condition.

Representative Green put it succinctly: "If we are writing the law, I would say that any institution could be all men or all women, but my own feeling is that they do it with their own funds and not taxpayers' funds." Representative Green also quoted

with approval President Nixon, who had stated, "Neither the President nor the Congress nor the conscience of the Nation can permit money which comes from all the people to be used in a way which discriminates against some of the people." To Senator Bayh, the reach of Title IX was clearly restricted to federally funded institutions. In support of Title IX, Senator McGovern stated, "I urge my colleagues to take every opportunity to prohibit Federal funding of sex discrimination." This legislative history clearly shows that Congress intended Title IX to be a "typical 'contractual' spending-power provision."

*Davis,* 120 F.3d at 1397–98 (citations omitted).

This Court thus finds that it is clear that Congress enacted Title IX pursuant to its powers under the Spending Clause. Even if there is some ambiguity injected into the inquiry by the fact that Title IX addresses subject matter covered by the Fourteenth Amendment, namely Equal Protection on the basis of sex, this Court will not "quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *See Gregory,* 501 U.S. at 469.

■ The Court recognizes, however, the recent body of case law, framing the proper inquiry as "whether Congress could have enacted the legislation at issue" pursuant to § 5 of the Fourteenth Amendment. *See Crawford,* 109 F.3d at 1283. *See also Franks,* 142 F.3d at ——, 1998 WL 193177; *CSX Transportation,* 138 F.3d 537, 539 (4th Cir.1998) (citing *Crawford* with favor). Because this Court finds that Congress could not have enacted Title IX, or amended Title IX by § 2000d–7 pursuant to its § 5 enforcement powers, Congress' attempt to abrogate States' Eleventh Amendment immunity for Title IX claims is unconstitutional under this test as well.

The protections afforded by Title IX differ from those afforded by the Equal Protection Clause in several important ways. First, and foremost, Title IX is voluntary in nature. Title IX prohibits discrimination on the basis of sex only by entities receiving federal funds. A state agency can discriminate if it

chooses to forego federal funds. Similarly, Title IX regulates private schools who choose to receive federal funding.

The Equal Protection Clause, however, only protects against action by *state*-sponsored entities. Federal funding does not make a public school a state actor. Thus, if Title IX had been enacted under the Fourteenth Amendment, then the antidiscrimination provision of Title IX would not reach federally funded schools that were not state actors. We think that the plain language of Title IX commands a different result: no school that receives federal funding may discriminate on the basis of gender. Therefore, we conclude that Title IX was enacted pursuant to a power that can reach non-state actors as well as state actors—the spending power.

*Davis,* 120 F.3d at 1398 n. 12 (citations omitted) (emphasis in original). *See also Rowinsky,* 80 F.3d at 1013 n. 14. The Court notes again the Supreme Court's recent decision in *Boerne,* that Congress' power under § 5 of the Fourteenth Amendment is limited to enforcing the substantive guarantees of the Fourteenth Amendment. *Boerne,* —— U.S. at ——, 117 S.Ct. at 2163. It is well settled law that the Equal Protection Clause only protects against action by state-sponsored entities. *See Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). Congress thus could not have enacted Title IX, which applies to private schools who receive federal funds, pursuant to its § 5 powers. If Congress truly intended to alter the meaning of the Equal Protection Clause, by affording protection against action taken by private entities, it would have overstepped its constitutional power in enacting Title IX. *See Boerne,* —— U.S. at ——, 117 S.Ct. at 2164 (Congress' power under section 5 is "remedial" and designed to enforce provisions of the Fourteenth Amendment, not to "decree the substance of the Fourteenth Amendment's restrictions on the States."); *In re Creative Goldsmiths of Washington, D.C., Inc.,* 119 F.3d 1140, 1146–47 (4th Cir.1997).

■ Similarly, under present judicial and executive interpretation, the substantive provisions of Title IX reach beyond the Fourteenth Amendment's prohibitions against

gender discrimination. Under Title IX, defendants face potential statutory liability for non-intentional (i.e. disparate impact) discrimination. *E.g., Jeldness v. Pearce,* 30 F.3d 1220, 1231 (9th Cir.1994) (affirming district court's holding that paying male prisoners for attending educational classes, but not paying female prisoners for attending such classes "violated Title IX, where no intent was required, but not the Equal Protection Clause"); *Roberts v. Colorado State Bd. of Agriculture,* 998 F.2d 824, 832 (10th Cir. 1993); *Mabry v. State Bd. of Comm. Coll. & Occ. Educ.,* 813 F.2d 311, 317 (10th Cir.1987); *Shuford v. Alabama State Bd. of Educ.,* 968 F.Supp. 1486, 1503–04 (M.D.Ala.1997); *Sharif by Salahuddin v. New York State Educ. Dept.,* 709 F.Supp. 345, 360–61 (S.D.N.Y. 1989) (relying in part on the majority's decision in *Guardians Assoc. v. Civil Service Comm.,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)). *Cf. Guardians Assoc. v. Civil Service Comm.,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (majority holding that proof of discriminatory effect suffices to establish liability when a suit is brought to enforce the regulations promulgated under Title VI, rather than statute itself). *Contra, Cannon v. University of Chicago,* 648 F.2d 1104, 1109 (7th Cir.1981). The Fourteenth Amendment, on the other hand, only recognizes intentional discrimination claims. *Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). Again, the substantive provisions of Title IX go beyond the Fourteenth Amendment's prohibitions against gender discrimination. Given the Court's holding in *Boerne,* legislation which alters the meaning of the Equal Protection Clause cannot be said to be enforcing the Clause. *Boerne,* —— U.S. at ——, 117 S.Ct. at 2164. Because Title IX alters the meaning of the Equal Protection Clause by affording protection from a greater range of defendants and by reaching a greater range of conduct, this Court finds that Title IX could not have been passed pursuant to Congress' section 5 enforcement power. Title IX was properly enacted pursuant to Congress' spending-power, and its spending-power alone. Accordingly, the portion of § 2000d–7 which purports to abrogate the States' immunity from suit in this Court for actions brought pursuant to Title IX, is unconstitutional as exceeding Congress' powers under § 5 of the Fourteenth Amendment.

C.

■ Plaintiff argues that, even if Congress does not have the authority to abrogate Defendant's Eleventh Amendment immunity through its powers under § 5 of the Fourteenth Amendment, Congress retained the "power of the purse" and hence control over how federal funds should be spent pursuant to its Article I Spending Clause powers.

In deciding whether Congress can properly require states to waive their Eleventh Amendment immunity and answer in federal court for claimed violations of Title IX, in return for accepting federal funding for educational programs, this Court is guided by two Supreme Court cases which address the issue of conditional waiver. In *South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), the Supreme Court was faced with a challenge to 23 U.S.C. § 158, which provided that the Secretary of Transportation should withhold a percentage of federal funds otherwise allocable from States "in which the purchase or public possession ... of any alcoholic beverage by a person who is less than twenty-one years of age is lawful." 483 U.S. at 205, 107 S.Ct. at 2795. South Dakota permitted persons age nineteen or older to purchase beer. *Id.* South Dakota argued that 158 violates the constitutional limitations on congressional exercise of the spending power and violated the Twenty-First Amendment. *Id.* The Supreme Court held that, even though Congress might lack the power to impose a national minimum drinking age directly, *encouragement* to state action found in § 158 is a valid use of the spending power. 483 U.S. at 212, 107 S.Ct. at 2798.

Similarly, in *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), the Supreme Court was faced with a challenge to Congressional legislation regarding the disposal of radioactive waste. 505 U.S. at 150–53, 112 S.Ct. at 2415–16. One of the provisions required the States to develop, over a seven-year period, a plan for disposal of radioactive waste generated with-

in and to be disposed within the state. *Id.* In order to provide an incentive for the States to make progress on creating their plans, Congress set forth in the legislation a series of "milestones." *Id.* If the States met the "milestones," they would be entitled to collect federal monies. *Id.* The Supreme Court held that this portion of the legislation, placing conditions (the achievement of "milestones") on the receipt of federal funds, is a valid conditional exercise of Congress' authority under the Spending Clause. 505 U.S. at 171–73, 112 S.Ct. at 2426–27.

■■■ These cases clearly demonstrate that Congress can condition a grant of federal funds on the States' willingness to consent to be sued in federal court. The fact that Congress is acting pursuant to its powers under the Spending Clause, an Article I power, is not an impediment, even after the Supreme Court's decision in *Seminole Tribe.*

> The breadth of [Congress' Spending Clause] power was made clear in *United States v. Butler* ... where the Court, resolving a longstanding debate over the scope of the Spending Clause, determined that "the power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution." Thus, objects not thought to be within Article I's "enumerated legislative fields," may nevertheless be attained through the use of the spending power and the conditional grant of federal funds.

*South Dakota v. Dole,* 483 U.S. at 207, 107 S.Ct. at 2796 (quoting *United States v. Butler,* 297 U.S. 1, 65–66, 56 S.Ct. 312, 319, 80 L.Ed. 477 (1936)). Thus, even though the Court in *Seminole Tribe* held that Congress does not have the authority pursuant to its Article I powers to simply *abrogate* the States' Eleventh Amendment immunity, Congress does have the power to require the States to *waive* their immunity pursuant to a valid exercise of its spending power.

However, Congress' ability under the Spending Clause to require states to waive their Eleventh Amendment immunity in return for federal monies is not unlimited. This power is subject to several general restrictions. In order to determine whether

Congress can properly require the Virginia to waive its immunity for suits brought under Title IX, as Plaintiff argues, this Court will examine whether Congress has violated any of these restrictions.

First, the exercise of the spending power must be in pursuit of "the general welfare." "In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress." *South Dakota v. Dole,* 483 U.S. at 207, 107 S.Ct. at 2796 (citations omitted). Defendant does not argue that Title IX or the amendment contained in § 2000d–7 violates this restriction, and the Court finds that it does not.

■■■ Second, if Congress desires to condition the States' receipt of federal funds, it "must do so unambiguously ..., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (quoting *Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1540); *Virginia Dept. of Educ. v. Riley,* 106 F.3d 559, 566 (4th Cir. 1997) (en banc). Defendant GMU argues that there is nothing in the text of Title IX or 42 U.S.C. § 2000d–7 which conditions the receipt of federal funds on the States' waiver of the Eleventh Amendment. GMU argues that, in the absence of such clear and unambiguous explicit statutory language, this Court cannot infer such a condition.

Plaintiff disagrees, and argues that under Title IX and § 2000d–7 it is abundantly clear that one of the conditions placed by Congress upon acceptance of federal funds under Title IX is the loss of Eleventh Amendment immunity. Section 2000d–7 provides in pertinent part: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ... Title IX ... or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal fund assistance." 42 U.S.C.A. § 2000d–7 (1994). The Court finds that this language is a clear and unequivocal expression of Congress' intent to condition the acceptance of federal funds on the States' agreeing to submit to the jurisdiction of the federal courts. The United States points to

the legislative history of § 2000d–7, which supports this finding as well. "To the extent that the proposed amendment [§ 2000d–7] is grounded on congressional spending powers, [§ 2000d–7] makes it clear to states that receipt of Federal funds constitutes a waiver of their Eleventh Amendment immunity." Brief of the United States in Intervention (citing 131 Cong.Rec. at 22,346; 132 Cong. Rec. at 28,624).

The third restriction on Congress' spending power is that conditions on federal grants might be illegitimate if they are unrelated "to the federal interest in particular national projects or programs." *South Dakota v. Dole*, 483 U.S. at 207, 107 S.Ct. at 2796 (quoting *Massachusetts v. United States*, 435 U.S. 444, 461, 98 S.Ct. 1153, 1164, 55 L.Ed.2d 403). The Court finds that Title IX and § 2000d–7 easily satisfy this requirement, and Defendant does not argue otherwise.

Fourth, "other constitutional provisions may provide an independent bar to the conditional grant of federal funds." 483 U.S. at 208, 107 S.Ct. at 2796. Defendant GMU argues that this requirement means that Congress cannot demand that the States surrender their Eleventh Amendment immunity as a condition of receiving federal funds. GMU cites *Federal Communications Comm'n v. League of Women Voters*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), in which the Supreme Court held that Congress could not demand that noncommercial television stations refrain from editorials as a condition of receiving federal funds. This Court finds the *Federal Communications* case is inapposite.

> The "independent constitutional bar" limitation on the spending power is not … a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly. Instead, we think that the language in our earlier opinions stands for the proposition that the power may not be used to induce the States to engage in activities that would themselves be unconstitutional. Thus, for example, a grant of federal funds conditioned on invidiously discriminatory state action or the infliction of cruel and unusual punishment

would be an illegitimate exercise of the Congress' broad spending power.

483 U.S. at 210–11, 107 S.Ct. at 2798. Because it is perfectly constitutional for a state to waive its Eleventh Amendment immunity, Congress' conditioning a state's receiving federal funds upon condition that it waive its Eleventh Amendment immunity, does not violate the "independent constitutional bar" limitation.

Finally, the Supreme Court has "recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" 483 U.S. at 211, 107 S.Ct. at 2798 (quoting *Chas. C. Steward Machine Co. v. Davis*, 301 U.S. 548, 590, 57 S.Ct. 883, 892, 81 L.Ed. 1279 (1937)). In *South Dakota v. Dole*, the Court found that all South Dakota would lose if it chose to keep its minimum drinking age at nineteen, rather that at age twenty-one as Congress desired, was 5% of the funds otherwise obtainable under specified highway grant programs. *Id.* Defendant does not argue that the financial inducement provided by federal monies offered under Title IX funding are so great as to be coercive, nor has Defendant provided the Court with any evidence of the amounts of money provided to the States for educational programs which are required to comply with Title IX. This Court, therefore, cannot find that the inducement offered by Congress can be called "coercive" in this case.

■ The Court will briefly mention Defendant's final argument with regards to the waiver issue. GMU argues that the mere receipt of federal funds does not constitute waiver of the Eleventh Amendment, and that waiver must be overt and explicit (such as a statutory declaration by the General Assembly) GMU argues that waiver cannot be implied. Quite the contrary, waiver may be implied, but only where the Congressional legislation at issue is clear that it is conditioning receipt of the federal funds on the waiver. As the Court discussed, *supra*, through enactment of § 2000d–7, Congress clearly indicated its intent to condition the States' receipt of federal funds upon an ac-

counting for the spending of those funds in federal court.

Under Title IX and 42 U.S.C. § 2000d–7, properly enacted pursuant to Congress' powers under the Spending Clause, it is clear that one of the conditions placed by Congress upon acceptance of federal funds under Title IX is the waiver of Eleventh Amendment immunity. Accordingly, Defendant's 12(b)(1) Motion to Dismiss Counts I and II for lack of subject matter jurisdiction is DENIED.

## III.

Defendant Dean Girard Mulherin ("Mulherin") has filed a Motion for Summary Judgment, arguing that no disputed facts remain regarding Count IV.

## A.

Summary judgment is proper if, viewed in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985). The nonmoving party is entitled to the most favorable inferences that may reasonably be drawn from the forecast evidence, *Ross*, 759 F.2d at 364, but it "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). The essence of the inquiry the court must make is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). Summary judgment is proper "if the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.* at 248.

## B.

] In its Order dated January 22, 1998, this Court denied Mulherin's Motion to Dis-

miss this due process claim. The Court denied Mulherin's motion at that time because Litman had alleged in her Complaint that, "[a]t the conclusion of the first day of the proceedings, and prior to the presentation of Litman's defense, a board member stated, 'I will make it clear that no new evidence will be presented. All evidence in this case is before us right now.'" Complaint at ¶ 97. This Court found that, if Plaintiff's allegations were true and it were also true that Litman did not have the opportunity to present her side during the first day of the hearing or at some other time, then this would be a clear due process violation of which a person in Dean Mulherin's position as Judicial Administrator should have known.

After the January 22 Memorandum Opinion and Order was mailed to the parties, counsel for Plaintiff mailed a letter to this Court:

> I write to bring to the Court's attention an apparent misunderstanding of the facts alleged by the Plaintiff in regard to the above referenced matter.
>
> At page seventeen of the Court's Memorandum Opinion of January 22, 1998, the Court denied Defendant Mulherin's Motion to Dismiss based upon the Court's belief that the Plaintiff had no opportunity to present her defense to the Student Judicial Board at her expulsion hearing.
>
> ... [I]t was not and is not Litman's position or allegation that she was entirely precluded from presenting her defense.

Letter from Annette Kay Rubin, counsel for Plaintiff, dated January 28, 1998.

The Court finds that the pertinent facts are thus no longer in dispute. Although Litman was not allowed to put on as much evidence as she would have liked, it is now uncontroverted that she was allowed to testify for several hours. Accordingly, Dean Mulherin's Motion for Summary Judgment is GRANTED.

## IV.

] Plaintiff Litman asks this Court to exclude certain healthcare providers from the requirement of preparing a written report pursuant to Fed.R. of Civ.P. 26(a)(2)(B).

Litman argues that only her treating physicians will be called to testify as to their diagnosis, observations, and opinions with respect to her medical and mental health in accordance with their treatment records of her. Plaintiff states that none of the physicians will be asked to testify as to matters outside the scope of their examination and treatment of the Plaintiff. Defendant Norris objects, and argues that it is unfair to "permit a party to employ a physician who treated an injured party to provide testimony extending beyond simply the care of the plaintiff to classic expert opinion regarding causation and prognosis" without submitting an expert report. Response on Behalf of Defendant Eugene M. Norris in Opposition to Plaintiff's Motion to Exclude Healthcare Providers from the Requirement of Preparing a Written Report Pursuant to Fed. R.Civ.P. 26(a)(2)(B) at 2 (citing *Thomas v. Consolidated Rail Corp.*, 169 F.R.D. 1 (D.Mass.1996)).

The Court finds a recent decision from the Norfolk Division of this Court instructive:

> If a treating physician forms an opinion of the causation of an injury to a patient and the prognosis of the patient's condition during the treatment then such opinion may be expressed by the treating physician without the necessity of a report under Fed.R.Civ.P. 26(a)(2)(B).... Defendants may still discover those opinions through interrogatories, requests for production of documents, and depositions of the treating physicians. However, if a physician, even though he may be a treating physician, is specially retained or employed to render a medical opinion based on factors that were not learned in the course of the treatment of the patient, then such a doctor would be required to present an expert written report.

*Hall v. Sykes*, 164 F.R.D. 46, 48–49 (E.D.Va. 1995).

Plaintiff has represented to this Court that the treating physicians who will testify at trial will confine their testimony to factors which were learned in the course of their treatment of Plaintiff. If the testimony were to go beyond this at trial, and expert reports had not been filed, it would be proper to exclude this portion of the testimony at that time in trial. Accordingly, Plaintiff's Motion to Exclude Healthcare Providers from the Requirement of Preparing a Written Report Pursuant to Fed.R.Civ.P. 26(a)(2)(B) is GRANTED.

## V.

▮] Plaintiff also asks this Court to amend and reverse its holding with respect to Count III of her Complaint, alleging Deprivation of Free Speech Rights, and with respect to Count V, alleging Deprivation of Equal Protection Rights, each against Defendants Orsak and Mulherin.

▮] With regards to this Court's dismissal of Count III, Litman argues that this Court erroneously applied the "public concern" test, which governs free speech in an employer/employee state relationship, and not the test in *Tinker v. Des Moines Ind. Comm. School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), which governs student protected speech and gives the state the power to control students' speech only if it "substantially interferes with school discipline or the rights of others." Even if this Court analyzed Litman's claim by looking at the Court's holding in *Tinker*, the Court would still dismiss Count III. Again, this Court dismissed Count III based on a finding that Orsak and Mulherin were entitled to qualified immunity. The Supreme Court in *Tinker* stated that "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513, 89 S.Ct. at 740. Part of the qualified immunity test is whether a reasonable person in the defendant's position would have known that his actions violated the plaintiff's First Amendment rights. *See Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir.1992). Defendants in this case could reasonably have viewed Litman's actions of sending numerous e-mails and other writings to professors regarding her claims of sexual harassment as highly disruptive of the professors' work, and

thus are entitled to qualified immunity even under the standard Plaintiff urges this Court to accept. Accordingly, Plaintiff's Motion to Reconsider the dismissal of Count III is DENIED.

Plaintiff's Motion to Reconsider the dismissal of Count V is without merit and is, accordingly, DENIED.

## ORDER

For the reasons stated in the Memorandum Opinion, it is hereby ORDERED that:

(1) Defendant George Mason University's Motion to Dismiss Counts I and II is DENIED;

(2) Defendant Dean Girard Mulherin's Motion for Summary Judgment is GRANTED;

(3) Plaintiff's Motion to Exclude Treating Healthcare Providers from the Requirement of Preparing a Written Report Pursuant to Fed.R.Civ.Pro. 26(a)(2)(B) is GRANTED;

(4) Plaintiff's Motion to Reconsider the Court's ruling dismissing her Equal Protection claim as to Defendants Orsak and Mulherin is DENIED;

(5) the Clerk of the Court shall forward copies of this Order and Memorandum opinion to all counsel of record.