**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ANNETTE GRECO LITMAN,
Plaintiff-Appellee,

UNITED STATES OF AMERICA,
Intervenor-Appellee,

v.

GEORGE MASON UNIVERSITY,
Defendant-Appellant,

and

EUGENE M. NORRIS; GEOFFREY
ORSAK; GIRARD MULHERIN,

No. 98-1742

Defendants.

AMERICAN CIVIL LIBERTIES UNION OF
VIRGINIA; TRIAL LAWYERS FOR PUBLIC
JUSTICE; AMERICAN ASSOCIATION OF
UNIVERSITY WOMEN; AMERICAN
ASSOCIATION OF UNIVERSITY WOMEN
LEGAL ADVOCACY FUND; AMERICAN
CIVIL LIBERTIES UNION WOMEN'S
RIGHTS PROJECT; NATIONAL WOMEN'S
LAW CENTER,
Amici Curiae.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-97-1755-A)

Argued: May 5, 1999

Decided: July 28, 1999

Before NIEMEYER, MICHAEL, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Michael and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** William Eugene Thro, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Alan Banov, Washington, D.C.; Seth Michael Galanter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Mark L. Earley, Attorney General of Virginia, Ronald C. Forehand, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Bill Lann Lee, Acting Assistant Attorney General, Jessica Dunsay Silver, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States. Mary Bauer, AMERI-CAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, Richmond, Virginia; Sarah Posner, TRIAL LAWYERS FOR PUB-LIC JUSTICE, P.C., Washington, D.C., for Amici Curiae.

_____

**OPINION**

NIEMEYER, Circuit Judge:

Annette Litman, a student at George Mason University in Fairfax, Virginia, filed this action against the University and some of its employees, alleging sex discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. To justify her suit against a state instrumentality in federal court, Litman relied on 42 U.S.C. § 2000d-7(a)(1), which provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title IX of the Education Amendments of 1972."

George Mason University claims with respect to § 2000d-7(a)(1) that (1) Congress lacked the requisite constitutional authority to abrogate its Eleventh Amendment immunity and (2) the provision does not unequivocally effect a voluntary waiver of its Eleventh Amend-

2

ment immunity. While the district court agreed with the University that Title IX exceeded Congress' remedial authority under § 5 of the Fourteenth Amendment to abrogate its Eleventh Amendment immunity, the district court upheld 42 U.S.C. § 2000d-7(a)(1) under the Spending Clause of Article I of the Constitution as a lawful condition of the University's voluntary acceptance of federal education funding under Title IX. For the reasons that follow, we affirm.

I

George Mason University ("GMU") is a state-created university "subject at all times to the control of the [Virginia] General Assembly." Va. Code Ann. § 23-91.24. Moreover, the parties agree that GMU is a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681(a). See 20 U.S.C. § 1687.

In her complaint, which supplies us with the facts in this case at the motion to dismiss stage, Annette Litman alleges that in 1995, as a student in GMU's "extended studies" program, she enrolled in a computer science course with Professor Eugene Norris, for whom she also worked as a research assistant. Over the course of the fall semester, Norris became infatuated with Litman, telling her routinely that he loved her and asking questions about her marriage and specifically about her sex life. Norris also stalked Litman, waiting for her after her speech class, on one occasion, to tell her that he "missed her" and that, despite her efforts to avoid him, he "had his ways" of locating her. After Litman terminated her research position with Norris, she received an e-mail from him stating, "Don't marry someone you can live with, Marry someone you can't live without."

In February 1996, Litman filed a sexual harassment complaint against Norris with GMU's Equity Office, requesting that Norris be reprimanded for his conduct and ordered to stay away from her. The Equity Office ordered Norris to avoid contact with Litman, but it refused to investigate the complaint further, characterizing Litman's allegations of sexual harassment as a "fishing expedition" grounded in conjecture. Finding this response inadequate, Litman sought the intervention of GMU's president. She also circulated a petition urging GMU to investigate Norris' alleged wrongdoings, but GMU failed to undertake the requested investigation.

3

Unable to locate a professor to supervise her senior research project, Litman maintained that GMU's faculty refused to interact with her once it became known that she had filed a sexual harassment complaint against one of its members. She thereafter sent suggestive and hostile e-mail messages to certain faculty members, resulting in two professors instituting sexual harassment charges of their own against her pursuant to GMU's Student Judicial Code. Following a trial before GMU's University Judicial Board in May 1996, the Board found Litman guilty of these charges and both imposed academic sanctions against her and expelled her from GMU. Litman asserts that the Board's process was so irregular that GMU effectively precluded her from preparing an adequate defense. Litman's complaint against Norris was tried in October 1996 and resulted in a finding that Norris had not violated GMU's sexual harassment policy.

In October 1997, Litman filed this action alleging that GMU and some of its employees discriminated and retaliated against her on the basis of her sex in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq. Invoking Eleventh Amendment immunity, GMU moved to dismiss the complaint for lack of jurisdiction. Litman responded, maintaining that Congress, through its enactment of the Civil Rights Remedies Equalization Act, 42 U.S.C. § 2000d-7(a)(1), abrogated GMU's Eleventh Amendment immunity, or, alternatively, that GMU waived its immunity as a condition to receiving federal funding under Title IX. When GMU contended that Congress' effort to abrogate GMU's Eleventh Amendment immunity was unconstitutional, the United States intervened, pursuant to 28 U.S.C. § 2403(a), to defend the constitutionality of 42 U.S.C. § 2000d-7(a)(1).

The district court denied GMU's motion to dismiss. Relying on City of Boerne v. Flores, 521 U.S. 507 (1997), the court determined that the protections afforded by Title IX differed from those afforded by the Equal Protection Clause of the Fourteenth Amendment in important ways. It concluded first that Title IX regulated both private and state-sponsored conduct, whereas the Equal Protection Clause, by its terms, regulated only state action. Second, it concluded that Title IX reached beyond the Fourteenth Amendment's prohibitions against gender discrimination by imposing liability on funding recipients for "non-intentional (i.e. disparate impact) discrimination." Litman v.

4

George Mason Univ., 5 F. Supp.2d 366, 374 (E.D. Va. 1998). The district court accordingly concluded that § 5 of the Fourteenth Amendment did not provide Congress with the authority to abrogate GMU's Eleventh Amendment immunity. The court went on to hold, however, that GMU waived its Eleventh Amendment immunity by accepting Title IX funding, which was conditioned on the unambiguous waiver of immunity codified in 42 U.S.C. § 2000d-7(a)(1). The court reasoned that while Congress does not have "the authority pursuant to its Article I powers to simply abrogate the States' Eleventh Amendment immunity, Congress does have the power to require the States to waive their immunity pursuant to a valid exercise of its spending power." Id. at 375. Relying on language in South Dakota v. Dole, 483 U.S. 203 (1987), and New York v. United States, 505 U.S. 144 (1992), the district court also emphasized that the Eleventh Amendment presented no "independent constitutional bar" to Congress' employing its spending power in this manner. Id. at 376 (internal quotation marks omitted).

From the district court's denial of GMU's motion asserting Eleventh Amendment immunity, GMU noticed this interlocutory appeal. See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 147 (1993) (holding that "States and state entities that claim to be `arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity").

II

On appeal, GMU contends that notwithstanding the provisions of the Civil Rights Remedies Equalization Act, 42 U.S.C. § 2000d-7(a)(1), which amended Title IX to make explicit that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title IX of the Education Amendments of 1972," it may not be sued in federal court. It argues that in enacting § 2000d-7(a)(1), Congress lacked the power to abrogate Eleventh Amendment immunity through § 5 of the Fourteenth Amendment and also that GMU did not consent to a waiver because "there is nothing in Title IX or in Congress' attempt to abrogate the Eleventh Amendment which states that waiver of the Eleventh Amendment is a condition of receiving federal funds."

5

Before determining whether Congress' effort to abrogate GMU's Eleventh Amendment immunity is justified by § 5 of the Fourteenth Amendment, we first consider whether GMU consented to waive its Eleventh Amendment immunity as a condition of receiving federal education funds.

The Eleventh Amendment provides in pertinent part that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." It is well established that this amendment, despite its express terms, also precludes citizens from bringing suits in federal court against their own states. See Hans v. Louisiana, 134 U.S. 1 (1890); see also Alden v. Maine, No. 98-436, 1999 WL 412617, at *15 (U.S. June 23, 1999) (emphasizing that the Eleventh Amendment confirms rather than establishes a state's sovereign immunity as a constitutional principle and that its sovereign immunity is not limited by the text of the Eleventh Amendment).

By limiting the federal judicial power over the states, the Eleventh Amendment preserves a federal balance and confirms the constitutional design in which each state remains a sovereign entity generally immune from suit. See Seminole Tribe of Florida v. Florida, 517 U.S. 44, 58, 72 (1996); see also Alden, 1999 WL 412617, at *28 (stating that "[t]he principle of sovereign immunity preserved by constitutional design thus accords the States the respect owed them as members of the federation" (internal quotation marks and citation omitted)). Inherent in this federal structure is the mutual, reciprocating respect for the state and federal sovereigns, and forcing one sovereign to appear against its will in the courts of another violates this respect. See Seminole Tribe, 517 U.S. at 54; see also Alden, 1999 WL 412617, at *7 (stating that because the "States retain a `residuary and inviolable sovereignty,' [t]hey are not relegated to the role of mere provinces or political corporations, but retain the dignity, though not the full authority of sovereignty" (quoting The Federalist No. 39)). Accordingly,

> [t]he Eleventh Amendment does not exist solely in order to prevent federal-court judgments that must be paid out of a State's treasury; it also serves to avoid the indignity of sub-

6

> jecting a State to the coercive process of judicial tribunals at the instance of private parties.

Seminole Tribe, 517 U.S. at 58 (internal quotation marks, brackets, and citations omitted).

The immunity guaranteed by the Eleventh Amendment, however, has well-established exceptions also inherent in the federal structure. First, Congress can abrogate the immunity without state consent if it acts pursuant to a valid exercise of constitutional power sufficient to abrogate the immunity and it unequivocally expresses its intent to do so. See Seminole Tribe, 517 U.S. at 55. Because the Fourteenth Amendment was adopted well after both the Eleventh Amendment and the ratification of the Constitution, and was designed to "expand[ ] federal power at the expense of state autonomy," the power granted to Congress by § 5 of the Fourteenth Amendment is recognized to "intrude upon the province of the Eleventh Amendment." Id. at 59. Accordingly, Congress may act under the authority of § 5 of the Fourteenth Amendment to abrogate a state's Eleventh Amendment immunity. See College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., No. 98-149, 1999 WL 412639, at *3 (U.S. June 23, 1999) (citing Fitzpatrick v. Bitzer, 427 U.S. 445 (1976)).

In addition, the Eleventh Amendment does not preclude the federal government from bringing suit against states in federal court to ensure compliance with federal law. See Seminole Tribe , 517 U.S. at 71 n.14; United States v. Texas, 143 U.S. 621, 644-45 (1892). Nor does the Eleventh Amendment preclude a private citizen from suing a state officer in federal court "to ensure that the officer's conduct is in compliance with federal law." Seminole Tribe, 517 U.S. at 71 n.14 (citing Ex Parte Young, 209 U.S. 123 (1908)).

Finally, a state may waive its Eleventh Amendment immunity by consenting to be sued in federal court. See College Savings Bank, 1999 WL 412639, at *3; Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997); Seminole Tribe, 517 U.S. at 63 (acknowledging the "unremarkable . . . proposition that the States may waive their sovereign immunity" (citations omitted)); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985). Permitting such waivers reflects the fact that sovereign immunity is an element of state sovereignty,

7

not a categorical limitation on the federal judicial power. See Coeur d'Alene Tribe of Idaho, 521 U.S. at 267 (stating that, because "a State can waive its Eleventh Amendment protection and allow a federal court to hear and decide a case commenced or prosecuted against it," the Eleventh Amendment "enacts a sovereign immunity from suit, rather than a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction" (emphasis added)); see also Erwin Chemerinsky, Federal Jurisdiction 406 (2d ed. 1994) (linking the Eleventh Amendment with principles of sovereign immunity and observing that "[t]raditionally, sovereign immunity could be waived and that principle has carried over to Eleventh Amendment jurisprudence").

A state may waive its immunity in two ways. See Booth v. Maryland, 112 F.3d 139, 145 (4th Cir. 1997). It may "directly and affirmatively waive its Eleventh Amendment immunity in a state statute or constitutional provision, as long as the provision explicitly `specif[ies] the state's intention to subject itself to suit in federal court.'" Id. (quoting Atascadero State Hosp., 473 U.S. at 241 (brackets in original)). Alternatively, it may "waive its immunity by voluntarily participating in federal spending programs when Congress expresses `a clear intent to condition participation in the programs . . . on a State's consent to waive its constitutional immunity.'" Id. (quoting Atascadero State Hosp., 473 U.S. at 247 (ellipses in original)).

But because of the Eleventh Amendment's vital role in preserving the federal balance, determinations of whether a State has waived its immunity are subjected to "stringent," exacting standards. College Savings Bank, 1999 WL 412639, at *7 (quoting Atascadero State Hosp., 473 U.S. at 241). Thus, a court may not find a waiver absent an "unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." Atascadero State Hosp., 473 U.S. at 238 n.1; see also Pennhurst State School v. Halderman ("Pennhurst I"), 451 U.S. 1, 17 (1981) (citations omitted); Edelman v. Jordan , 415 U.S. 651, 673 (1974). "The whole point of requiring a `clear declaration' by the State of its waiver is to be certain that the State in fact consents to suit." College Savings Bank, 1999 WL 412639, at *9. Accordingly, a State cannot be deemed to have waived its Eleventh Amendment immunity constructively even by engaging in activities after Congress has "made clear that such activity would subject[the State] to suit [in

8

federal court]." Id. at *4, *9 (overruling Parden v. Terminal R. Co. of Ala. Docks Dep't, 377 U.S. 184 (1964)). Similarly, the "mere receipt of federal funds cannot establish that a State has consented to suit in federal court." Atascadero State Hosp., 473 U.S. at 246-47 (citations omitted).

Litman contends in this case that GMU, by accepting federal education funds under Title IX, has, as a condition of receiving those funds, unambiguously waived its Eleventh Amendment immunity. The district court agreed. GMU, on the other hand, contends that while 42 U.S.C. § 2000d-7(a)(1) indicates, albeit unconstitutionally, that it is subject to suit in federal court, "there is nothing in the text that even remotely suggests that Virginia's public universities must waive the Eleventh Amendment as a condition of receiving federal funds. Indeed, the statute does not even contain the word `waiver.'" It argues that a statute "must say something like `as a condition of receiving federal funds under this Act, the States agree to waive their Eleventh Amendment immunity'" and that absent such explicit language, the mere receipt of Title IX funds cannot effect a waiver.

To resolve this dispute, we turn to the applicable statutory provisions to determine whether they provide unambiguously that GMU, by agreeing to receive federal education funds under Title IX, has waived its Eleventh Amendment immunity.

III

The statutory framework applicable to this case is straightforward. Title IX provides that in connection with any education program or activity receiving federal financial assistance, stipulated here to include GMU's program, "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination." 20 U.S.C. § 1681(a). The Supreme Court has held that this provision gives a student an implied right of action for sexual harassment by a teacher in such a program, provided the program's officials have "actual notice of, and[have been] deliberately indifferent to, the teacher's misconduct." Gebser v. Lago Vista Indep. School Dist., 118 S. Ct. 1989, 1993 (1998). Finally, 42 U.S.C. § 2000d-7(a)(1) provides that for a violation of the antidiscrimination

9

edict in § 1681(a), a state "shall not be immune under the Eleventh Amendment . . . from suit in Federal court."

Section 1681(a), which precludes the use of Title IX federal education funds for discriminatory purposes, was enacted under the Spending Clause of the Constitution, U.S. Const. art. I,§ 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes .. . to . . . provide for the . . . general Welfare of the United States"). As a federal spending program, it operates "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." Pennhurst I, 451 U.S. at 17; see also Davis v. Monroe County Bd. of Educ., 119 S. Ct. 1661, 1669 (1999) (characterizing Title IX as Spending Clause legislation); Gebser, 118 S. Ct. at 1997 (same). In other words, in exercising its spending power, the federal government "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." Gebser, 118 S. Ct. at 1997 (citations omitted); see also Davis, 119 S. Ct. at 1670. And it also conditions these funds on the recipient state's consent to be sued in federal court for an alleged breach of the promise not to discriminate. See 42 U.S.C.§ 2000d-7(a)(1).

Because of the mutuality required in a contractual relationship of this type -- the federal grant in exchange for state agreement to attached conditions -- the legitimacy of the attached conditions rests "on whether the State voluntarily and knowingly accepts the terms of the `contract.'" Pennhurst I, 451 U.S. at 17 (citations omitted). Thus, Spending Clause legislation, in contrast to other Article I legislation or § 5 legislation, presents a state with a choice: the state can either comply with certain congressionally mandated conditions in exchange for federal funds or not comply and decline the funds. Similarly, "Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts." College Savings Bank, 1999 WL 412639, at *12. As the Supreme Court has observed, the attachment of conditions to grants made under the Spending Clause is a "permissible method of encouraging a State to conform to federal policy choices." New York v. United States , 505 U.S. 144, 168 (1992). The Court explained,

> If a State's citizens view federal policy as sufficiently contrary to local interests, they may elect to decline a federal

10

grant. If state residents would prefer their government to devote its attention and resources to problems other than those deemed important by Congress, they may choose to have the Federal Government rather than the State bear the expense of a federally mandated regulatory program, and they may continue to supplement that program to the extent state law is not pre-empted. Where Congress encourages state regulation rather than compelling it, state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people.

Id. As a general proposition, therefore, when Congress acts pursuant to its spending power, there is no categorical prohibition against its attaching conditions to grants made to the states. See College Savings Bank, 1999 WL 412639, at *12; New York, 505 U.S. at 167; South Dakota v. Dole, 483 U.S. 203, 206 (1987).

This mechanism for exercising power under the Spending Clause, however, must have limits. Otherwise, Congress "could render academic the Constitution's other grants and limits of federal authority." New York, 505 U.S. at 167. Indeed, an unlimited Spending Clause power could circumvent the entire constitutional structure. As Justice O'Connor observed,

> [i]f the spending power is to be limited only by Congress' notion of the general welfare, the reality, given the vast financial resources of the Federal Government, is that the Spending Clause gives "power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed."

South Dakota, 483 U.S. at 217 (O'Connor, J., dissenting) (quoting United States v. Butler, 297 U.S. 1, 78 (1936)).

The Supreme Court has recognized at least five such limitations. First, the exercise of the spending power must be for the general welfare. See U.S. Const. art. I, § 8, cl. 1; South Dakota, 483 U.S. at 207. Second, if the grant or expenditure is, when made to the states, accompanied by conditions, the conditions must be stated "unambigu-

11

ously." South Dakota, 483 U.S. at 207. Third, any conditions imposed must "bear some relationship to the purpose of the federal spending" so that a reasonable nexus exists between the two. New York, 505 U.S. at 167; South Dakota, 483 U.S. at 207-08; Massachusetts v. United States, 435 U.S. 444, 461 (1978) (plurality opinion). Fourth, the grant or expenditure and the conditions attached to it may not violate any independent constitutional prohibition. See South Dakota, 483 U.S. at 208. And fifth, the financial inducement offered by Congress must not be "so coercive as to pass the point at which pressure turns into compulsion." Id. at 211 (internal quotation marks and citations omitted); see also Virginia Dep't of Educ. v. Riley, 106 F.3d 559, 570 (4th Cir. 1997) (en banc) (plurality opinion of Luttig, J.) (finding coercive Congress' withholding of "the entirety of a substantial federal grant on the ground that the States refuse to fulfill their federal obligation in some insubstantial respect rather than submit to the policy dictates of Washington in a matter peculiarly within their powers as sovereign States").

In the context of Title IX as applicable to the case before us, Congress has attached at least two conditions to GMU's receipt of Title IX funding: (1) GMU cannot discriminate on the basis of sex, see 20 U.S.C. § 1681(a), and (2) when responding to alleged acts of discrimination, GMU waives its Eleventh Amendment immunity, see 42 U.S.C. § 2000d-7(a)(1). This appeal requires us to determine whether these conditions, considered together, fall within the limitations imposed on Congress' Spending Clause power under current Supreme Court jurisprudence.

GMU does not contend that Title IX funds are not spent for the general welfare; that the prohibition of discrimination and the accompanying waiver of Eleventh Amendment immunity are not reasonably related to grants of education funds; or that the attachment of conditions to the funding arrangement is coercive. Rather, it maintains that it did not knowingly waive its Eleventh Amendment immunity because that condition of waiver was not made unambiguously clear in the text of § 2000d-7(a)(1). That provision, GMU observes, uses neither the term "condition" nor the term "waiver." GMU also contends that Congress may not impose a waiver of Eleventh Amendment immunity as a condition of funding: "it is constitutionally impossible for Congress to require the States to waive the Eleventh

12

Amendment as a condition of receiving federal funds." We address these two points in order.

A

GMU acknowledges that it voluntarily accepts Title IX funding. Indeed, it must apply for federal funds. And in connection with any application, it must assure the Federal Government of its intent to comply with 20 U.S.C. § 1681(a). Implementing regulations provide that each recipient of Title IX funding must enter into a contract of assurance with the Department of Education and thereby manifest its intent to adhere to the conditions imposed by Title IX. See 34 C.F.R. § 106.4(a) (providing, in pertinent part, that"[e]very application for Federal financial assistance for any education program or activity shall as condition of its approval contain or be accompanied by an assurance from the applicant or recipient, satisfactory to the Assistant Secretary, that each education program or activity operated by the applicant or recipient and to which this part applies will be operated in compliance with this part"). Thus, in voluntarily accepting federal education funds, GMU is unequivocally put on notice of three conditions: (1) that it may not discriminate in its programs on the basis of sex, see 20 U.S.C. § 1681(a); (2) that if it does discriminate on the basis of sex, it may be sued by a private individual, see Gebser, 118 S. Ct. at 1996, 1999; and (3) that in any such suit, it may not assert its Eleventh Amendment immunity, see 42 U.S.C. § 2000d-7(a)(1). There can be no doubt that GMU is able "to ascertain what is expected of it" in return for federal education funds. Pennhurst I, 451 U.S. at 17.

The Supreme Court appears to have acquiesced in this same construction, characterizing the waiver language of§ 2000d-7(a)(1) as unequivocal. In the context of evaluating whether, under § 2000d-7(a)(1), federal agencies, like private entities, would be subject to monetary damages for Rehabilitation Act violations, the Court observed:

> By enacting [42 U.S.C. § 2000d-7(a)(1)], Congress sought to provide the sort of unequivocal waiver that our precedents demanded.

13

* * *

> Given the care with which Congress responded to our deci-
> sion in <u>Atascadero</u> by crafting an <u>unambiguous waiver of
> the States' Eleventh Amendment immunity</u> in [42 U.S.C.
> § 2000d-7(a)(1)], it would be ironic indeed to conclude that
> the same provision "unequivocally" establishes a waiver of
> the Federal Government's sovereign immunity against mon-
> etary damages awards . . . in the remedies provision attached
> to the <u>unambiguous waiver of the States' sovereign
> immunity</u>.

<u>Lane v. Pena</u>, 518 U.S. 187, 198, 200 (1996) (emphasis added).

Thus, we conclude that Congress succeeded in its effort to codify
a clear, unambiguous, and unequivocal condition of waiver of Elev-
enth Amendment immunity in 42 U.S.C. § 2000d-7(a)(1). In enacting
that section, Congress responded with "care" to "[the Supreme
Court's] decision in <u>Atascadero</u> by crafting an unambiguous waiver
of the state's Eleventh Amendment immunity." <u>Id.</u> at 200; <u>accord</u>
<u>Clark v. California</u>, 123 F.3d 1267, 1271 (9th Cir. 1997) (relying on
42 U.S.C. § 2000d-7(a) in the context of holding that California, by
accepting federal funds under the Rehabilitation Act, waived its Elev-
enth Amendment immunity), <u>cert</u>. <u>denied sub nom</u>. <u>Wilson v.
Armstrong</u>, 118 S. Ct. 2340 (1998). Moreover, any state reading
§ 2000d-7(a)(1) in conjunction with 20 U.S.C.§ 1681(a) would
clearly understand the following consequences of accepting Title IX
funding: (1) the state must comply with Title IX's antidiscrimination
provisions, and (2) it consents to resolve disputes regarding alleged
violations of those provisions in federal court.

In reaching this conclusion, we reject GMU's assertion that a stat-
ute "must say something like `as a condition of receiving federal
funds under this Act, the States agree to waive their Eleventh Amend-
ment immunity.'" The only difference between GMU's proffered lan-
guage and that employed in § 2000d-7(a)(1) is that the former is cast
in the affirmative (i.e., "the States agree to waive") and the latter in
the negative (i.e., "a State shall not be immune"). But this difference
in phrasing is of no constitutional import. Using negative rather than
affirmative language does not alter the plain meaning of § 2000d-

14

7(a)(1) -- that is, by accepting Title IX funding, a state agrees to waive its Eleventh Amendment immunity.

B

GMU's second argument, that Congress cannot employ its spending power in a manner that conditions a state's receipt of funding upon a waiver of Eleventh Amendment immunity, is also without merit under current Supreme Court jurisprudence. While the Supreme Court in South Dakota noted that the spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional," 483 U.S. at 210, such as conditioning a grant of federal funds "on invidiously discriminatory state action or the infliction of cruel and unusual punishment," id. , it stated that the range of permissible conditions extended beyond the original enumerations of congressional power granted by the Constitution, see id. Thus, while abrogating Eleventh Amendment immunity would be impossible unless exercised under the Fourteenth Amendment, see Seminole Tribe, 517 U.S. at 59, conditioning federal funds on an unambiguous waiver of a state's Eleventh Amendment immunity is as permissible as a state's direct waiver of such immunity. See Alden, 1999 WL 412617, at *32 ("Nor, subject to constitutional limitations, does the Federal Government lack the authority or means to seek the States' voluntary consent to private suits" (citing South Dakota)); see also College Savings Bank, 1999 WL 412639, at *12 & n.2 (suggesting that Congress, in legislating under the Spending Clause, can condition a waiver of sovereign immunity upon the states' acceptance of a federal grant). Thus, when a condition under the Spending Clause includes an unambiguous waiver of Eleventh Amendment immunity, the condition is constitutionally permissible as long as it rests on the state's voluntary and knowing acceptance of it. See Atascadero State Hosp., 473 U.S. at 238-40; Pennhurst I, 451 U.S. at 17.

Accordingly, we conclude that Congress, in enacting 42 U.S.C. § 2000d-7(a)(1), permissibly conditioned GMU's receipt of Title IX funds on an unambiguous waiver of GMU's Eleventh Amendment immunity, and that, in accepting such funding, GMU has consented to litigate Litman's suit in federal court.

IV

The important role that the Eleventh Amendment plays in our federal structure demands that we pause to consider the larger implications of concluding that a state waives its immunity from suit in federal court by accepting Title IX funding. This inquiry is especially important given the recent intensity with which the Supreme Court and this circuit have focused on issues of federalism, separation of powers, and a limited federal government. See , e.g., Alden v. Maine, No. 98-436, 1999 WL 412617 (U.S. June 23, 1999); College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., No. 98-149, 1999 WL 412639 (U.S. June 23, 1999); Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank , No. 98-531, 1999 WL 412723 (U.S. June 23, 1999); Printz v. United States, 521 U.S. 898 (1997); City of Boerne v. Flores, 521 U.S. 507 (1997); Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996); United States v. Lopez, 514 U.S. 549 (1995); New York v. United States, 505 U.S. 144 (1992); Gregory v. Ashcroft, 501 U.S. 452, 457-59 (1991); Brzonkala v. Virginia Polytechnic Inst., 169 F.3d 820 (4th Cir. 1999) (en banc); Brown v. North Carolina Div. of Motor Vehicles, 166 F.3d 698 (4th Cir. 1999); Condon v. Reno, 155 F.3d 453 (4th Cir. 1998), cert. granted, 119 S. Ct. 1753 (1999); In re Creative Goldsmiths of Washington, D.C., Inc., 119 F.3d 1140, 1145 (4th Cir. 1997), cert. denied sub nom. Schlossburg v. Maryland Comptroller of Treasury, 118 S. Ct. 1517 (1998).

These decisions collectively counsel that we not lightly conclude that principles of federalism and state sovereign immunity permit Congress to employ its spending power in a manner that ultimately effects a waiver of a state's Eleventh Amendment immunity. See generally Lopez, 514 U.S. at 578 (Kennedy, J., concurring) ("[T]he federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far"). Specifically, any conclusion we reach today must respect the Supreme Court's admonition in Seminole Tribe that the "Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent limitations placed upon federal jurisdiction." 517 U.S. at 72-73. Further, we must acknowledge that "[r]ecognizing a congressional power to exact constructive

16

waivers of sovereign immunity through the exercise of Article I powers would also, as a practical matter, permit Congress to circumvent the antiabrogation holding of <u>Seminole Tribe</u>." <u>College Savings Bank</u>, 1999 WL 412639, at *11.

We do not intend to question these propositions. However, we do not read <u>Seminole Tribe</u> and its progeny, including the Supreme Court's recent Eleventh Amendment decisions, to preclude Congress from conditioning federal grants on a state's consent to be sued in federal court to enforce the substantive conditions of the federal spending program. Indeed, to do so would affront the Court's acknowledgment in <u>Seminole Tribe</u> of "the unremarkable . . . proposition that States may waive their sovereign immunity." 517 U.S. at 65. Furthermore, in <u>New York</u> the Court emphasized that principles of federalism do not pose an independent constitutional bar to Congress' powers under the Spending Clause:

> By [employing the spending power to attach conditions on the States' receipt of federal funding], as by any other permissible method of encouraging a State to conform to federal policy choices, the residents of the State retain the ultimate decision as to whether or not the State will comply. If a State's citizens view federal policy as sufficiently contrary to local interests, they may elect to decline a federal grant.

<u>New York</u>, 505 U.S. at 168. If the Supreme Court were one day to adopt a Madisonian construction of the Spending Clause,* perhaps

_____

*As an original matter, Alexander Hamilton and James Madison appear to have taken different positions regarding the scope and purposes of the Spending Clause. Hamilton contended that "[t]he terms `<u>general Welfare</u>' [as used in the Spending Clause] were doubtless intended to signify more than was expressed or imported in those which Preceded; otherwise numerous exigencies incident to the affairs of a Nation would have been left without a provision." Alexander Hamilton, Report on Manufacturers (Dec. 5, 1791), <u>reprinted in</u> 2 <u>The Founders' Constitution</u> 446, 446 (Philip B. Kurland & Ralph Lerner eds., 1987). He reasoned:

> The phrase is as comprehensive as any that could have been used; because it was not fit that the constitutional authority of the

17

Congress would be inhibited from implementing a spending program that both intruded upon a state's general police powers and conditioned the outlay of funding on a state's waiving its sovereign immu-

_____

> Union to appropriate its revenues shou'd have been restricted within narrower limits than the "General Welfare" and because this necessarily embraces a vast variety of particulars, which are susceptible neither of specification nor of definition.

Id. at 446-47.

Madison, on the other hand, believed that the history underlying the insertion of the "general Welfare" language into the Spending Clause proved Hamilton's construction to be error. He contended that the Framers never "understood [that phrase to] invest Congress with powers not otherwise bestowed by the constitutional charter." Letter from James Madison to Andrew Stevenson (Nov. 27, 1830), reprinted in 2 The Founders' Constitution, supra, 453, 456. Madison grounded his construction of the Spending Clause in principles underlying our federal order:

> [F]or it exceeds the possibility of belief, that the known advocates in the Convention for a jealous grant and cautious definition of Federal powers should have silently permitted the introduction of words or phrases in a sense rendering fruitless the restrictions and definitions elaborated by them.
>
> Consider for a moment the immeasurable difference between the Constitution limited in its powers to the enumerated objects, and expounded as it would be by the import claimed for the phraseology in question. The difference is equivalent to two Constitutions, of characters essentially contrasted with each other -- the one possessing powers confined to certain specified cases, the other extended to all cases whatsoever; for what is the case that would not be embraced by a general power to raise money, a power to provide for the general welfare, and a power to pass all laws necessary and proper to carry these powers into execution; all such provisions and laws superseding, at the same time, all local laws and constitutions at variance with them? Can less be said, with the evidence before us furnished by the journal of the Convention itself, then that it is impossible that such a Constitution as the latter would have been recommended to the States by all the members of that body whose names were subscribed to the instrument?

18

nity. In deciding this case, however, we are bound by the Court's existing constructions of the scope of Congress' spending power.

Because we hold that GMU, through its acceptance of Title IX funding, waived its Eleventh Amendment immunity, we need not reach the question of whether Congress can constitutionally abrogate that immunity through § 5 of the Fourteenth Amendment. Accordingly, the judgment of the district court is

AFFIRMED.

_____

* * *

> The Constitution is a limited one, possessing no power not actually given, and carrying on the face of it a distrust of power beyond the distrust indicated by the ordinary forms of free Government.

Id. at 455, 457.

In United States v. Butler, 297 U.S. 1 (1936), albeit in dictum, the Supreme Court appears to have acquiesced in the Hamiltonian position:

> While, therefore, the power to tax is not unlimited, its confines are set in the clause which confers it, and not in those of § 8 which bestow and define the legislative powers of the Congress. It results that the power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution.

Id. at 66. The Court confirmed its adoption of the Hamiltonian view one year later in Steward Machine Co. v. Davis, 301 U.S. 548, 586-87 (1937) (Cardozo, J.) (upholding New Deal legislation and observing that "[i]t is too late today for the argument to be heard with tolerance that in a crisis so extreme the use of the moneys of the nation to relieve the unemployed and their dependents is a use for any purpose narrower than the promotion of the general welfare" (citing Butler , 297 U.S. at 65-66)).

19