**Robert BANE, Plaintiff,**

v.

**VIRGINIA DEPT. OF CORRECTIONS, Defendant.**

**Civil Action No. 7:00cv00052.**

United States District Court,
W.D. Virginia,
Roanake Division.

Aug. 14, 2000.

Robert Allen Bane, Big Stone Gap, VA, pro se.

Pamela Anne Sargent, Office of Attorney General, Richmond, VA, for Defendant.

### *Memorandum Opinion*

TURK, District Judge.

This matter is before the Court on defendant, Virginia Department of Corrections' ("VDOC") motion to dismiss and supplemental motion to dismiss. Plaintiff Robert Bane ("Bane"), proceeding *pro se*, filed this suit against VDOC alleging violations of Title II of the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12131–12165.[1] Plaintiff responded to defendant's motions to dismiss. Upon consideration of the record, briefs submitted by both sides, and the applicable law, the Court will grant defendant's motions to dismiss.

### I.

Bane is a Virginia prisoner currently incarcerated at Wallens Ridge State Prison in Big Stone Gap, Virginia. Bane suffers from a variety of ailments including nerve damage and scar tissue in his right leg and shoulder and mental illness. Bane alleges that due to the physical injury to his leg and shoulder, he is, *inter alia,* unable to comply with the prison's shackling policy and needs a shower chair to safely shower. Bane also has requested a single cell at the prison because of his history of mental illness. The prison administration has refused to grant any of Bane's requests on the grounds that do to so would pose a security risk or the request is not medically indicated. Bane alleges this failure by the prison to accommodate his physical and mental disabilities is in violation of the ADA.

VDOC has moved to dismiss Bane's complaint for lack of jurisdiction on two related grounds: (1) Virginia is immune from this suit under the Eleventh Amendment; and (2) Congress exceeded its Fourteenth Amendment § 5 powers when it attempted to abrogate the States' immunity in enacting the ADA. Bane has responded to the motions to dismiss and the case is now ripe for disposition. Appropriate notice pursuant to Federal Rule of Civil Procedure 24(c) of VDOC's constitutional challenge to the ADA was given to the United States Attorney General on April 28, 2000.

### II.

The government has moved to dismiss this action for lack of subject matter jurisdiction. When considering a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the court should consider "whether plaintiff'[s] allegations, standing alone and taken as true plead[ed] jurisdiction and a meritorious cause of action." *Dickey v. Greene,* 729 F.2d 957, 958 (4th Cir.1984). Once subject matter jurisdiction is challenged, the burden of establish-

---

1. Plaintiff's complaint did not explicitly allege an action under 42 U.S.C. § 1983, however VDOC, in its first motion to dismiss, identifies Plaintiff's causes of actions as arising under the ADA and § 1983. VDOC, as an agency of the state, is an improper defendant in a § 1983 action. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (The Commonwealth, like any state, is not a "person" within the meaning of § 1983). Therefore, to the extent that Plaintiff's claim can be construed as a § 1983 action, it is dismissed for failure to state a claim.

ing its existence always rests upon the party asserting jurisdiction. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991), cert. denied, 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992). The court should regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Id.* (citing *Adams v. Bain,* 697 F.2d 1213, 1216 (4th Cir.1982)). In a Rule 12(b)(1) case, the court must give the plaintiff the same procedural protections provided under Rule 12(b)(6); thus, all the facts alleged in the complaint are assumed true and all factual inferences are drawn in the plaintiff's favor. *Adams,* 697 F.2d. at 1219.

### III.

The Eleventh Amendment to the United States Constitution provides that:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens or Subjects of any Foreign State.

This amendment provides immunity to a State "from suits brought in federal courts by her own citizens as well as by citizens of another state." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). State agencies, as arms of the state, are also entitled to assert immunity under the Eleventh Amendment. *Id.*

There are two ways a state may be divested of its Eleventh Amendment immunity: (1) waiver of that immunity; and (2) abrogation of that immunity by Congress through a statutory enactment. *Litman v. George Mason University,* 186

F.3d 544, 550 (4th Cir.1999), cert. denied, —— U.S. ——, 120 S.Ct. 1220, 145 L.Ed.2d 1120 (2000). Because VDOC has not waived its sovereign immunity in this case, the question before this Court is whether Congress properly abrogated the States' immunity to claims brought pursuant to the ADA.[2]

Congress' power to abrogate a state's immunity is derived from its enforcement powers under Section 5 of the Fourteenth Amendment. See *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 65–66, 116 S.Ct. 1114, 1128–29, 134 L.Ed.2d 252 (1996) (holding *inter alia* that Congress lacks authority to abrogate state sovereign immunity pursuant to the Commerce Clause and affirming Congress' power to do so under the Fourteenth Amendment). Congress explicitly relied on its Fourteenth Amendment enforcement power in enacting the ADA. See 42 U.S.C. § 12101(b)(4) (stating that "it is the purpose of this chapter ... to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by peoples with disabilities."). The Fourteenth Amendment provides, in relevant part,

> Section 1. . . . No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

> Section 5. Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

2. Bane relies principally on the Fourth Circuit's panel opinion in *Amos II* to support his position that the States' Eleventh Amendment immunity was properly abrogated with respect to Title II of the ADA. *Amos v. Md. Dept. of Pub. Safety,* 178 F.3d 212 (4th Cir.1999). However, in that case, a rehearing was grant- ing en banc and the judgment was vacated on December 28, 1999. No rehearing was subsequently held because the parties reached a settlement. See *Amos v. Md. Dept. of Pub. Safety,* 205 F.3d 687 (4th Cir.2000). Therefore, *Amos* is not controlling precedent in this Circuit.

However, Congress is not unlimited in its power to abrogate state immunity. The Supreme Court in *Seminole Tribe* articulated a two part test to determine the validity of Congress' abrogation of a state's immunity from suit. First, it must be determined "whether Congress has unequivocally expressed its intent to abrogate the immunity." *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114 (citation omitted).

Second, a court must determine "whether Congress has acted pursuant to a valid exercise of power." *Id.*

Here, the first prong of the test is easily addressed. Section 12202 of the ADA states, "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." Clearly, Congress has expressed its intent to abrogate the State's immunity under the ADA.

Determining whether Congress acted pursuant to a valid exercise of power is a tougher proposition. Because Congress' power to abrogate the States' immunity lies only in § 5 of the Fourteenth Amendment, Congress is constrained by the language of that section. The Supreme Court has held that,

> Congress' power under § 5 ... extends only to 'enforcing' the provisions of the Fourteenth Amendment. The Court has described this power as 'remedial.' The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States ... Congress does not enforce a constitutional right by changing what the right is.

*City of Boerne v. Flores*, 521 U.S. 507, 519, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997) (citation omitted).

"In other words, Congress has the power to remedy violations of constitutional rights, not [the power] to define the substance of those rights." *Brown v. N.C. Div. of Motor Vehicles*, 166 F.3d 698, 705 (4th Cir.1999). However, determining whether Congress has exceeded its enforcement powers and has substantially defined a constitutional right by enacting the ADA has proven to be a difficult task. Compare *Muller v. Costello*, 187 F.3d 298 (2nd Cir.1999); *Martin v. Kansas*, 190 F.3d 1120 (10th Cir.1999); *Garrett v. University of Ala. at Birmingham Bd. of Trustees*, 193 F.3d 1214 (11th Cir.1999), *cert. granted*, —— U.S. ——, 120 S.Ct. 1669, 146 L.Ed.2d 479 (2000); *Coolbaugh v. Louisiana*, 136 F.3d 430 (5th Cir.1998), *cert. denied*, 525 U.S. 819, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998); *Clark v. California*, 123 F.3d 1267 (9th Cir.1997), with *Erickson v. Bd. of Govs.*, 207 F.3d 945 (7th Cir.2000), *petition for cert. filed*, (U.S. June 26, 2000) (No. 99-2077); *Brown v. N.C. Div. Of Motor Vehicles*, 166 F.3d 698 (4th Cir.1999); and *Alsbrook v. Maumelle*, 184 F.3d 999 (8th Cir.1999). However, it is generally agreed that the "congruence and proportionality" standard articulated by the Supreme Court in *Boerne* is the bedrock upon which the § 5 powers analysis depends. In *Boerne*, the Court stated, "[t]here must be a congruence and proportionality between the [constitutional] injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect." *Boerne*, 521 U.S. at 520, 117 S.Ct. 2157. "If the [legislation] at issue exceeds [Congress'] Section 5 powers, 'it is without jurisdictional effect and cannot constitutionally abrogate immunity.'" *Alsbrook*, 184 F.3d at 1006 (1999) (quoting *Brown*, 166 F.3d at 703).

In *Boerne*, the Supreme Court applied the "congruence and proportionality" test to the Religious Freedom Restoration Act of 1993 (RFRA) and determined RFRA was not a valid enactment by Congress under its § 5 powers. The Court first considered the legislation's congruence

with the constitutional violations it was drafted to prohibit. In doing so, the Court reviewed the factual findings made by Congress in support of RFRA's passage and noted that the record was devoid of references to the type of conduct RFRA was designed to remedy or prevent. Because of this lack of documentation, the Court concluded that RFRA had not been designed to address unconstitutional conduct and could not be considered a remedial or preventive statute, "if those terms are to have any meaning." *Boerne*, 521 U.S. at 532, 117 S.Ct. 2157.

The Court next considered the "proportionality" of RFRA in light of the constitutional injury it was designed to remedy. The Court noted that "[s]weeping coverage ensures [RFRA's] intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." *Id.* The Court found that the Act was "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.* The Court also rejected RFRA because the Act could not be understood as enforcing the provisions of Fourteenth Amendment. The Court concluded that RFRA attempted to expand the substantive meaning of the Fourteenth Amendment by requiring more stringent judicial scrutiny of laws burdening free exercise of religion in contradiction to the standard previously articulated by the Court in *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *Id.* at 536, 117 S.Ct. 2157.

In its most recent consideration of the scope of Congress' § 5 powers, the Supreme Court applied the "congruence and proportionality" standard articulated in *Boerne* to the Age Discrimination in Employment Act (ADEA) and concluded that Congress again had exceeded its § 5 powers. See *Kimel v. Fla. Bd. of Regents*, ––– U.S. –––, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). The Court first considered the proportionality of the ADEA in light of any unconstitutional conduct the statute was designed to address. Second, the Court reviewed the legislative record of the statute to see if it reflected either: (1) a pattern of age discrimination by state actors; or (2) any unconstitutional age discrimination. *Id.* at 649. The Court found that the ADEA was a significantly disproportionate remedy to the problem of unconstitutional age discrimination. The Court noted that discrimination based on age was subject only to rational basis review and that most discrimination based on age would be found constitutional under this low standard. The Court concluded that the ADEA targeted "very little conduct likely to be held unconstitutional." *Id.* at 648. With regard to the legislative record, the Court found the record did not reflect any unconstitutional discrimination by the states, and clearly was deficient of a pattern of age discrimination committed by the states. In conclusion, the Court stated, "the indiscriminate scope of the Act's substantive requirements, and the lack of evidence of widespread and unconstitutional age discrimination by the States" rendered the ADEA an invalid exercise of Congress' § 5 powers. *Id.* at 650.

The Fourth Circuit also has had an opportunity to issue an opinion regarding the appropriateness of legislation enacted pursuant to Congress' § 5 powers. Last year, the Court determined that a regulation promulgated under the ADA was not adopted pursuant to a valid exercise of Congress' § 5 power. See *Brown*, 166 F.3d at 698. In *Brown*, the plaintiffs were purchasers of North Carolina handicapped parking permits, who challenged North Carolina's attempt to charge a fee for the permits. Plaintiffs claimed the fee violated a regulation promulgated under the ADA which prohibited public entities from charging fees for programs implemented by the entity to comply with the ADA. The Court began its analysis by finding that physical disability was not a suspect class

and that the "constitutionality of state laws affecting the disabled must thus be measured by rational basis review." *Brown*, 166 F.3d at 706. Continuing, the Court found that only arbitrary state action or state action motivated by animus would fail the rational basis test. The Court found that the legislative record supporting the ADA and the regulation at issue contained only generalized findings of discrimination and failed to indicate the ADA or the regulation were designed to target unconstitutional state action. The Court concluded that the fee charged by North Carolina was constitutional under rational basis review and that the regulation forbidding it could not be considered as remedying a constitutional violation. The Court also addressed the potential prophylactic aspect of the regulation and concluded because the scope and duration of the regulation was so broad, it was out of proportion to its supposed remedial or preventive objective as to be beyond Congress' § 5 powers. *Id.* at 707.

The analysis employed by the Supreme Court in *Boerne* and *Kimel* and the Fourth Circuit's directive in *Brown*, compels this Court's conclusion that Title II of the ADA is not appropriate legislation under Congress' § 5 powers and that Congress' attempt to abrogate States' immunity must fail. With an eye toward brevity and a desire to avoid repeating what has been said most competently by other courts on this topic, what follows is a truncated analysis from this Court's perspective.

In determining whether Title II of the ADA is a valid exercise of Congress' § 5 power, this Court must determine whether the ADA is a "congruent and proportional" legislative reaction to violations of the Fourteenth Amendment rights enjoyed by persons with disabilities. In doing so, I will rely on the Supreme Court's recent clarification of the "congruence and proportionality" test originally set forth in *Boerne*. See *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav.*

*Bank*, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999). "Congruence" requires an identification of the "'evil' or 'wrong' that Congress intended to remedy, guided by the principle that the propriety of any § 5 legislation 'must be judged with reference to the historical experience ... it reflects." *Id.* at 2207 (quoting *Boerne*, 521 U.S. at 525, 117 S.Ct. 2157). "Proportionality" considers whether the provisions of the statute are proportional to their remedial or preventive object. *Boerne*, 521 U.S. at 532, 117 S.Ct. 2157.

In enacting the ADA, the evil Congress sought to target was discrimination against persons with physical and mental disabilities. See 42 U.S.C. § 12101(a)(7) (finding that disabled individuals are a "discrete and insular minority who have been ... subjected to a history of purposeful unequal treatment ... based on characteristics that are beyond the control of such individuals."). In order for Congress to validly enact legislation to remedy this history of inequality, the discrimination must "give rise to the Fourteenth Amendment violation that Congress sought to redress in the [ADA]." *Florida Prepaid*, 119 S.Ct at 2207. In other words, there must be a connection between the constitutional injury complained of and the statute designed to address it.

The Supreme Court in *Boerne* remained unconvinced that there was such a connection between RFRA and the unconstitutional religious discrimination it was designed to remedy. *Boerne*, 521 U.S. at 531, 117 S.Ct. 2157. The Court found that RFRA's legislative record lacked much evidence of recent examples of the type of unconstitutional conduct the Act was drafted to prohibit, suggesting that such discrimination was not such a widespread problem as to warrant federal legislation. In light of this meager record, the Court concluded the argument that RFRA was necessary legislation to remedy widespread unconstitutional religious discrimination lacked merit. *Id.*

A review of the legislative record makes clear that the ADA, like RFRA, is not particularly closely connected to the unconstitutional discrimination it was designed to remedy.

In support of the ADA's passage, Congress made extensive and detailed findings of past discrimination against persons with physical and mental disabilities. These findings have been recounted at length in various other cases that have considered this issue. See e.g. *Coolbaugh,* 136 F.3d at 435; *Martin,* 190 F.3d at 1127 n. 6. However, the factual findings underlying the ADA do not specify the type of discrimination persons with disabilities have suffered; rational discrimination which would be constitutional under *Cleburne* or unconstitutional irrational discrimination. "Instead, Congress used the word 'discrimination' in § 12101, and Committees in Congress used that word in the legislative history, to refer to any disadvantage that accompanies a disability." *Erickson,* 207 F.3d at 951. As such, the record does not support the position that the ADA was solely enacted to remedy violations of constitutional rights of disabled persons. The record is also deficient in instances of unconstitutional state discrimination against the disabled. There is no finding that states, prior to the ADA, engaged in widespread arbitrary or intentional discrimination against the disabled. It therefore cannot be said that Congress was primarily concerned with prohibiting unconstitutional discrimination on the basis of disability when it enacted the ADA or that the ADA has particular congruence with the unconstitutional conduct it was designed to prohibit.

The second prong of the inquiry focuses on the proportionality of the statute in light of its stated preventive or remedial goal. It is worth noting here that Congress, pursuant to its § 5 powers, is limited to enforcing the provisions of the Fourteenth Amendment.

The constitutional rights of the disabled under the Equal Protection Clause were defined by the Supreme Court in *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In that case, the Court held that state action involving persons with mental disabilities was subject only to rational basis review. *Id.* at 446, 105 S.Ct. 3249. Subsequent cases have held that the standard established in *Cleburne* is applicable to all state action involving persons with both mental and physical disabilities. See *Brown,* 166 F.3d at 706 (citing *Coolbaugh,* 136 F.3d at 433 n. 1; *Clark,* 123 F.3d at 1270). Under this standard, state action involving persons with disabilities will only be held violative of the Equal Protection Clause "if it is [not] rationally related to a legitimate state interest." *Cleburne,* 473 U.S. at 446, 105 S.Ct. 3249. The result of this lower standard of review is that the right of persons with disabilities guaranteed under the Equal Protection Clause is simply the right to be free of government action which is not rationally related to any legitimate government purpose. See *Erickson,* 207 F.3d at 949–50; *Alsbrook,* 184 F.3d at 1008. Because Congress is limited by § 5 to enforcement of the other provisions of the Fourteenth Amendment, Congress' power under § 5 is limited to enacting legislation which enforces the rational basis standard articulated by the Supreme Court in *Cleburne.*

The question becomes, then, does the ADA enforce the Fourteenth Amendment? As the following discussion illustrates, the question must be answered in the negative because the ADA creates new substantive rights and clearly exceeds the scope of the Fourteenth Amendment.

Discrimination on the basis of disability is subject only to a rational basis review under current Equal Protection jurisprudence. However, the ADA requires states to "reasonably modify" state programs or to "reasonably accommodate" disabled employees above and beyond any obligations placed on them by the Constitution. Section 12132 of the ADA places a duty on states to "reasonably modify" their pro-

grams, services and activities to ensure that persons with disabilities will not be excluded. A state is relieved of its obligation to provide "reasonable modifications" of its programs only if such modifications would "fundamentally alter" the nature of the program or activity. See *Alsbrook*, 184 F.3d at 1009 (citing 28 C.F.R. § 35.130(b)(7)). "Reasonable modification" is not defined in Title II and raises the question as to how fundamentally a state must alter its program, activity or service to comply with the ADA. Under this section, a state's program, service or activity which passes constitutional review under the rational basis test, could be invalidated under the ADA.

Further, the mandates of Title I of the ADA regarding "reasonable accommodation" are also beyond the scope of protections afforded disabled employees under the Fourteenth Amendment. Section 12112 (applicable to public employers pursuant to 28 C.F.R. § 35.140(b)(1)) requires employers to make "reasonable accommodation" to the known disability of an applicant or an employee, unless to do so would impose an "undue hardship" on the employer. Again, this affirmative duty to accommodate may be beyond the scope of a public employer's obligation under the Equal Protection Clause.

The "reasonable modification" and "reasonable accommodation" requirements transform the ADA from a remedial statute "into a charter for positive rights." *Brown*, 166 F.3d at 707. Although the Act ostensibly was passed with the goal of eradicating unequal treatment for persons with disabilities, the Act's substantive provisions demand not equal treatment, but treatment which specially considers the claimed disability. In this respect, the ADA differs significantly from other antidiscrimination laws which prohibit unequal treatment and advocate neutral treatment of individuals without regard to the specified characteristic. Unlike these laws, the ADA demands consideration and unequal treatment solely on the basis of disability.

Additionally, the affirmative obligations on the state to either accommodate or proffer a reason for failure to accommodate, result in a heightened judicial scrutiny for laws that affect those with disabilities. Under the ADA's substantive clauses, employment decisions and state programs affecting the disabled persons are subjected to a higher standard of judicial review than rational basis. "The ADA ... specifically takes issue with the [Supreme] Court's definitional choice [that the mentally disabled were a large and diversified group] and declares that 'individuals with disabilities are a discrete and insular minority.' (citation omitted) This declaration evinces an intent not to remedy violations of the standard of *Cleburne*, but rather to effect a 'substantive alternation of its holding.' In striking state legislation that is clearly rationally grounded, Congress sought to do what *Cleburne* said it may not do-establish a new suspect or quasi-suspect equal protection classification." *Brown*, 166 F.3d at 708. Thus, this Court concludes, because the ADA creates new substantive rights and affords greater protections to disabled persons than those available under the Equal Protection Clause, it cannot be said that the ADA "enforces" the Fourteenth Amendment.

The ADA is also out of proportion with the unconstitutional behavior it was designed to prohibit. The Supreme Court in *Kimel*, noting that the ADEA prohibited "substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard," concluded that the ADEA failed the *Boerne* "proportionality" test. *Kimel*, 120 S.Ct. at 647. In *Boerne* itself, in concluding that RFRA lacked proportionality with its targeted unconstitutional conduct, the Court stated, RFRA's "sweeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and

regardless of subject matter." *Boerne,* 521 U.S. at 532, 117 S.Ct. 2157.

The same can be said of the ADA. Like the ADEA and RFRA, the ADA is unlimited in its scope, has the potential to affect all state employers and programs, and in fact, is likely to prohibit significantly more employment decisions and programs than would be found unconstitutional. The ADA was not drafted to prohibit only unconstitutional discrimination, and in practice, may invalidate constitutional employment decisions made by public employers and state sponsored programs and services. As such, I must conclude that the ADA is also "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent unconstitutional behavior." *Kimel,* 120 S.Ct. at 647 (quoting *Boerne,* 521 U.S. at 532, 117 S.Ct. 2157).

As a final concern, in the light of the above discussion suggesting that the ADA is not appropriate remedial legislation, could the ADA be considered prophylactic legislation? Again, this Court must turn to the legislative record to determine whether the ADA is an appropriate response to unconstitutional state discrimination against those with disabilities. "The sort of findings that would permit adoption of the ADA as a precautionary measure ... must establish that states have been able to disguise forbidden discrimination as the permissible kind." *Erickson,* 207 F.3d at 952. Although the record is replete with instances of discrimination against persons with disabilities, it is devoid of findings suggesting that states engaged in covert unconstitutional discrimination. In fact, states were not even identified as a primary source of unconstitutional discrimination in the legislative record. The ADA, then, cannot appropriately be considered preventive legislation.

In sum, it follows that the ADA does not enforce the Fourteenth Amendment and that Congress exceeded its § 5 powers when it attempted to apply Title II of the ADA to the states. As such, Congress' attempted abrogation of Virginia's Eleventh Amendment immunity is not valid and this Court lacks jurisdiction over plaintiff's ADA claim.

### III.

For the reasons stated above, the Court finds that defendant's motions to dismiss pursuant to 12(b)(1) are granted.

### *FINAL ORDER*

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

### ADJUDGED AND ORDERED

that defendant's motions to dismiss are **GRANTED.**

The Clerk is directed to strike this matter from the active docket of the Court and to send certified copies of this Order and the accompanying Memorandum Opinion to all pro se parties and counsel of record.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).